181778, 181813, 181867, and 181976, the Parent Professional Advocacy League et al. v. City of Springfield et al. Mr. Ulden, good morning. Good morning, Your Honor. If I may, may I reserve five minutes for rebuttal? You may. Thank you, Your Honor. Jeff Goldman of Morgan Lewis for the Appellants and Cross Appellees, with me at Council Table are Robert Fleishner of the Center for Public Representation and Jennifer Mathis of the Bazelon Center for Mental Health Law. This case illustrates why the ADA exists. We're here on behalf of a group of approximately 200 children in Springfield. Children as young as kindergartners, who are punished on account of their disability. These are children of great promise, who in the words of the expert report for the Court of Class Certification are well within the normal range for cognitive ability, and who can be educated in neighborhood schools with non-disabled children. Instead, these children are warehoused in a segregated and inferior school called the Public Day School. The school is inferior by any metric. The children there, unlike the non-disabled peers, are punished through physical restraints, isolation in padded rooms, frequent punitive suspensions. They have no or very limited access to arts, sciences, foreign languages, or sports. They receive a less rigorous curriculum. And most critically, they're given no ability to interact during school day with non-disabled children, or therefore to enjoy any of the benefits normally inherent in a public school education that are dependent on that kind of interaction. We have read your complaint. We've read all of the briefing very carefully. Perhaps you should turn directly to the issues on appeal. Sure. Thank you, Your Honor. We contend that there are five errors of law, starting with one overarching error, which is the district court's holding, expressed in various ways but several times, that the IDEA somehow limits the ADA in its application to public schools. I'm sorry. I thought the issue was exhaustion. I understand that's a sub-argument as to exhaustion. Perhaps you could get to the exhaustion issue. Sure. Well, the most critical piece of the exhaustion issue is that the original named plaintiff in this class did exhaust administrative remedies. He went to the BSEA, as far as he could, had his claim rejected, and then filed a lawsuit. The BSEA, in the course of that exhaustion process, emphatically rejected the opportunity to become involved in this case in relevant ways. And we explain this in our movement brief at page 5. That just sounds so abstract. I don't even know what you mean when you say that. When you spoke for the first two minutes here, it sounded exactly like an IDEA appeal in which you're complaining that the disabled child has been put in a segregated facility rather than being mainstreamed, as is one of the priority mandates of the IDEA. So I would think if the complaint is that a child should be put in the regular classroom or the regular school and not put in a more restrictive environment, that's right in the sweet spot of an IDEA proceeding that you would argue it seems there's such a heavy overlap here. And it would be a child-by-child proceeding in which someone would be required to determine whether that child could make meaningful educational and non-curricular gains in what the least restrictive environment is that would facilitate that. What the BSEA did do in this case, and the decision from the hearing officer is in the record, is looked at two alternatives as they presently existed and determined whether the parent had proved that the alternative placement that the parent wanted was a more reasonable placement than the placement that the school wanted, based entirely on the experience of one child and based entirely on the services that the school is willing to offer in neighborhood schools. But if the hearing officer misapplied the IDEA, that doesn't mean that there isn't the type of overlap that would require exhaustion. It simply means the hearing officer misapplied the IDEA, and under the IDEA you would have grounds to set that aside. If one of these students goes, can't they ask for a plan that puts them into one of the regular schools? Indeed, the Springfield schools do have a number of students who perhaps meet very similar criteria in terms of their needs, who they do put into the public schools with other support services. It's just that under IDEA, not everybody gets into the public schools. As to some of that group of students, roughly 200, my memory is there's 350 in the public schools. In a more integrated session. But it's not as though Springfield has made no effort to comply with the LRE, Least Restrictive Environment requirements. And it seems to have been determined on a case-by-case basis through the LRE and the LRE, the IDEA exhaustion procedures. Well, some children have, a small number of children have exhausted. No, no, you've missed my point. I don't understand your answer. Maybe you better tell me why you think that's significant. The plans here are not for violation of the IDEA. To the extent there was a requirement that the IDEA be exhausted because plaintiffs are seeking relief that could also be obtained under the IDEA, that exhaustion happened. But that exhaustion happened for one student who dropped out of the case. Who determined not to be a named plaintiff anymore. That's called dropping out of a case. So one student goes and exhausts. It may well be that the hearing officer erred and that student should have been mainstreamed. In which case if the student had proceeded forward with his IDEA appeal, he may well have won and have been mainstreamed. But what does that tell us then about the next student who hasn't even exhausted? Much less all remaining 199 students. It's inconceivable based on your description of the relevant disabilities that everyone isn't in exactly the same situation. It would not be surprising if the school goofed as to some and probably should have mainstreamed some of them. It wouldn't be surprising if others, they perhaps had a strong argument for the difficulties of mainstreaming. We don't know because you've presented us with this abstract, studentless, everybody's the same, no exhaustion, no administrative record. Which then makes it very hard to tell if in the case of any given student there's been an injustice or violation of the law here. The injustice or violation of the law we're alleging is not that the student was placed in the wrong school. The injustice that we're alleging is that Springfield fails to offer on a systemic basis services and supports that are required under the ADA. Okay, sometimes in these cases there is a particular policy which is under attack. That is not the case here. You have simply put the label systemic on your complaint. But in the end it amounts to the results of the compliance with the IDEA exhaustion requirements. Either a determination has been made that they can go into the regular public schools with support services or a determination has been made, perhaps mistakenly, that they can't do that. That the least restrictive environment is a different environment. And for you to say that somehow there is a policy here, I don't understand it. Well, I will contend there are two policies. First is the policy that you alluded to, which is that students with very, very similar disabilities are sent to the same school by virtue of the fact that Springfield does not provide in the neighborhood school services that those students need. But it does in fact provide neighborhood school services for some children with special support. Your claim is there is a group of 200 children who should be in that category. And you claim you can proceed in the lawsuit without us even knowing what the IDEA exhaustion would produce as to those 200 students. Well, I mean, Your Honor, the BSEA hears 20 or 30 cases a year from throughout the state. So it's, you know, as the Seventh Circuit said in the Lacey case, which is a case certifying IDEA, I'm sorry, an IDEA class. You know, these are, I'm sorry, I alluded to the wrong case. I apologize. The Second Circuit in the Hanbury case. That the nature and volume of these cases is incapable of resolution on an individualized basis. It would take 10 years for these cases to get to the BSEA and require an enormous investment in lawyer time and parent time. But the BSEA has held repeatedly, both in the SS case and then in a related case that was also, and the children tend to move on. Let me give you an example. Suppose the city went through the 200 students that you're talking about and it found the one with the most severe and intractable behavioral difficulties. That they had, in fact, tried to and it had been, it hadn't worked so it took that student. And we tried that one student's case and the student lost because of a finding that that student's disabilities were so intractable mainstreaming was not possible. Would that mean all other 199 students automatically lost? No. I think not. We would have to look at the next student and the next student might have a different complex of behavioral issues that could be dealt with with certain services. And that student would then win. But you've prevented us from having any feel for the reality of the situation by grumping all 200 together and then using labels like systemic discrimination when it seems instead you've got a case where there's an accumulation of individual decisions that you think slant in the wrong direction, cumulatively. I don't think that's all we're alleging, Your Honor. Because we're also alleging that the conditions in the school are an ADA violation. And that's, you know, whether termed as a policy or a practice is clearly a policy or a practice that affects every member of the class and affects them in very much the same way. So even if you, even if for some reason, and again I would believe it would be inappropriate to exclude. That isn't the case you pled, nor is it the class you purported to represent. You talk a lot about how you are a master of your own pleadings. You live and die by that. Furthermore, IDEA requires an evaluation to be made every year. And some of your plaintiffs may move from some of these schools to a more mainstream school. And it's a moving target. It's a moving population depending on what the fate plan is for a given child in a given year. That's true. With respect to your first question, you know, the complaint does clearly indicate that the... It includes a lot of stuff. And it doesn't differentiate among them. And I don't think it was a requirement that we do so. Okay. Can I move you along to another topic I'm interested in? Before you go off, I would like to ask something about exhaustion. Are you familiar with the acronym FAPE? FAPE? Yes. Yes, sir. Is that involved in this case? No, it's not. And isn't it... Does IDEA require exhaustion only if you are asking that issue? Correct, Your Honor. So that is exactly my point. Because you didn't make it up to now. Well, I appreciate the question. The case does not have the... It is not an element of our case to prove the denial of a FAPE in any particular case or in 200 cases. And it's not a defense to our case that they prove in one or 200 cases that a FAPE was provided. So in that sense, in addition to the practical impossibilities of pursuing this on an individual basis under the IDEA, it simply would be impractical. Judge Lynch, I interrupt you again. You have had a plaintiff student who has dropped out of the case. You've got two organizations who purport to be plaintiffs. I'd just like you to spend a minute or two on, even if one assumes that one or the other of those meet the associational standing requirements, why they would not also be bound by exhaustion. After all, the statute that DLC is operating under does seem to expressly require exhaustion. I think there's three answers to that, Your Honor. Okay. First, the claims here and what's required under the IDEA exhaustion statute is exhaustion of the claims. Those claims were exhausted in almost precisely the same words in which they're raised in our complaint. Second, in terms of the application of the IDEA exhaustion requirement, there is no administrative avenue for DLC or PPAL to pursue an administrative remedy. And your third reason? And my third reason is that to the extent that the defendants would like to invoke the exhaustion rule under the PAIMI Act, that's an affirmative defense that they've backed down, an affirmative defense that we're not required on the pleadings to plead the nonexistence of. Okay. So tell me your view of how this works. Let's assume no class is certified and no other student joins in the action, and you and DLC proceed solely on your own. What happens to the claim of a given student who has not yet come forward with the claim and hasn't joined you but still might want to claim if you lose? If we were to lose on the ADA claim, I think that if there were a class certified, No, no, no, come on. If there were not a class certified, then there would not be a preclusive effect on another child. So we try your whole case, you lose, then student A can come forward and bring that exact same case. That's one of the reasons that class certification would be so appropriate here. Right, but we're talking about the possibility of no class, which the court denied a class, if we were to affirm that. It seems to me to present it can't be the result that you get to try the case and lose, and then student A gets to try the case again. And yet it also can't be the case that you could try the case without – I don't see where your independent standing comes from just as a practical matter. Well, I think the DLC statute is established as a statutory matter, but in terms of dealing with what I think is Your Honor's question, which is what happens if DLC were to proceed alone and lose, I mean certainly I think normal claim preclusions and registrata rules would apply. Which means? Which means that to the extent that a student raises claims that were raised by DLC, and that is a student who could have joined or intervened, then the student would be precluded. But I think that's well down the road from what we are. Are there any cases in which your or a similar organization of the DLC has proceeded solely on its own without any individual involved and in which then the preclusion issues have been addressed? I'm not sure in which the preclusion issues have been addressed, but certainly there are cases where protection advocacy organizations have brought claims on their own without individuals. And this whole issue hasn't come up of how they could have standing if there's either no preclusion or preclusion of someone who didn't want to be precluded? Well, I mean I think that functionally DLC would be, under its statutory mandate, bringing a claim on behalf of the kids who are in the school now. It would be bringing that claim much like the children's parents would be bringing the claim. And those students would, you know, I haven't thought through this to be honest. I think those students probably would be precluded from re-litigating it. Another student who came to the school five years later may be in a different boat. One last question. Suppose parent A didn't want their child moved and you won? There's no, there's no, we're not seeking, and this goes to Judge Correa's question, this is not a case where we're seeking school placements. This is a case where we're seeking the remediation of improper and illegal conditions at one school and the imposition in other schools of services that we believe are required by the ADA. I thought you were complaining about segregation of these students into a separate school rather than being mainstreamed into the regular schools. That was the whole first two minutes of your presentation here. Because our contention is for all or almost all of these students that segregation is unnecessary and unwanted. All right. Thank you. Oh, did you have a question? No. Oh, all right. Ma'am? Good morning, Your Honors, and may it please the Court. I lost your name. I can't think of your name. My name is Lisa DeSouza. Sorry. And I'm a deputy city solicitor for the city of Springfield, Massachusetts. With me this morning at council table is Melinda Phelps from Buckley-Ridgerton, who represents the Springfield Public School Department, and my brother counsel, Steve Holstrom, also from Buckley-Ridgerton. I would like to ask you some questions about the class certification. And we've had the case of Fry versus Napoleonic Community School in 2017. How does that case affect the decision that denying the class certification is at all? I believe that the Fry case supports Judge Bastiani's decision to deny class certification in this case, although the case was decided a little bit after the denial of class certification. And specifically in Fry, the Supreme Court enunciated two clues that would help courts determine whether the gravamon of any particular complaint, although it may be styled as being brought under the ADA, for example, the issue is whether the gravamon of that complaint actually addresses issues that would be governed by the IDEA. And those two questions are whether that student would be able to bring the identical claim in a setting other than the school, another place of public accommodation, such as a library or a movie theater. Here, the claim is that the city and the school department has failed to provide sufficient behavioral interventions in the neighborhood schools to accommodate the behaviors there, and that leads to them going to a wholly segregated setting. Clearly, a person with significant behavioral and emotional issues could not ask a movie theater to make behavioral interventions sufficient to allow them to sit through a two-hour movie, for example. Well, why not? Because the... I mean, you could require a movie theater to provide a rampway instead of stairs, couldn't you? I think that's exactly right. And so suppose you can provide them that they have a little section of the theater where the lights don't flash, and that accommodates someone who has some trigger due to flashing lights. That might be an individual requirement that the ADA would reach. And that would be in a movie theater to address a behavioral problem of some potential patrons of the theater. That particular case, whether or not a court would decide that was a reasonable accommodation based on the numbers of people coming, the cost of it, et cetera, that would be decided under the normal statutory interpretation of ADA. However, the types of interventions that the students at issue here need are far greater than that. For example, many of the students are unable to remain seated, and they're allowed to leave and reenter the classrooms of the public day school in a way that they would be unable to do in the neighborhood school. Similarly, they would be unable to do that in a movie theater without disrupting all of the other patrons, and I find it unlikely that any court would find that that was a reasonable accommodation. It's the types of behavioral interventions at issue here, I think, that sets it apart. Similarly, if an adult with that level of disability reaches the second flagpole, now if an adult entering that school needed similar types of services, could they bring that claim? So again, let's assume it's an adult, non-student adult, who's entering the school to attend a performance at the school, but they're unable to, because of their own disabilities, sit for two hours. They're unable to remain quiet. They are unable to stop themselves from having outbursts. The school would not have to accommodate that type of behavioral disruption as part of an ADA claim, and since we suggest the answers to both of those cases are very clearly no, Frye leads us to say, therefore, the gravamon of the complaint here is actually based in the IDEA, and exhaustion is appropriate. Not just appropriate, it's required. As I read Frye, those aren't the only two criteria. Frye also refers to whether the information developed under IDEA as to the FAPE would be useful, and it's an idea also in the Frazier opinion from this court. And there's been no argument made, to my knowledge, that that information would not be of any use to a court in reviewing these claims. I think that the plaintiffs have suggested, kind of in their futility argument, that it would not be necessarily useful. And due to the highly individualized nature of the disabilities in addition, I think that's clearly false. Let me, just as a factual matter, the students who are assigned to the day school in elementary school, do any of them ever go into a more mainstreamed environment as the years go on? Yes, and also sometimes during the years. There's a fluidity to the population at the public day school, not just in the elementary school, Your Honor, but all through. Both middle school students and high school students. As Your Honor indicated in questioning my brother's counsel, there's an obligation under the IDEA that the IEP be reviewed annually. Certainly that would be the time and place if school officials themselves had not suggested it for parents or guardians or outside support services to bring a request to have a trial period back in a more mainstream school. In Springfield, if I could, just get a little bit of demographic information about the city, because I think it helps the court in determining the facts in this case. We are the second largest school system in New England. We are second largest only to Boston. There's approximately 26,000 students in our public schools in the last few years. Of those students, over 5,000, or about 20% of our students, have disabilities such that they have an IEP under the IDEA. And of those, anywhere from 5 to 700 of the 5,000 plus with IEPs have the types of social-emotional disorders that the plaintiffs have identified as their purported class. Of those 5 to 700, somewhere around 200 at any given moment are in the three separate schools that make up the public day school system. Judge Mastriani made findings based on the record at the class certification stage that the city provides a continuum of services for all students, but specifically with regard to students who have social and emotional disorders in the neighborhood schools. Those include SEBS classrooms, which are at the elementary and middle school level, wholly separate classrooms where students may stay in for part of the day or all of the day. The school system has also implemented PBIS, Positive Behavioral Interventions and Supports. And that is across all schools, not quite yet. They've been rolling it out, but the goal is to have that across all schools and all classrooms. It's not limited to students with any disability at all. Rather, it is the school department's attempt to have the kind of behavioral interventions and supports that the plaintiffs identified in their complaint as their remedy available for all students who are in the public schools to maximize their ability to learn in mainstream classrooms. Is it available in the day schools? The day schools are wholly behaviorally driven. They are, you know, very, very tailored to these individual students' needs. As you can tell by the numbers, these are very small schools with small numbers of students and high adult ratios. They have all sorts of behavioral supports and interventions available at the public day school that aren't feasible to have. Sometimes, for example, a student may need to sit under their desk in the public day school and move back and forth from under the desk to their chair. Sometimes they may need to walk in and out of the classroom. Although, to be fair, in the neighborhood schools, many of the schools have adopted a tab, take a break room for students in an attempt to maximize the number of kids that are available that are able to access their education in a more mainstream setting. However, that record, which was in front of Judge Mastriani, drove his decision on the denial of class certification. And I think essentially there was two issues that drove that. The first is that the remedy articulated by the plaintiffs is wholly unworkable. Judge Mastriani stated that while they were lofty and well-meaning goals, they were completely unworkable as a remedy in a class case. They identified school-based behavioral services as if it's a one-size-fits-all program that we could just be enjoined to offer. Leaving aside the fact that the record is pretty clear that we already offer a whole lot of behavioral interventions and supports, the determination of what level of those types of behavioral interventions would be necessary would absolutely require an individualized determination. That individualized determination is already codified in the IDEA due process hearing structure. The second reason that I feel that the court denied class certification, there are myriad reasons in the decision, but the complaint as recited here this morning by my Board of Counsel focuses on alleged deficiencies in the public day school and further focuses on this termed illegal segregation. And yet they do not focus a remedy based on the public day school. Rather, they focus a remedy that involves the neighborhood schools. If there were, in fact, a claim brought that we were illegally restraining children or we were acting in the, I believe the term counselor used this morning, was punishing students by having them be there, that could be a case. But it's not this case. The remedy being sought here is not directed to that at all. And I say that my time is running very short. You're addressing, because of the procedural posture in this case, it's here before us on the merits of a dismissal, and it's here and there's also a class certification ruling. Do you understand the plaintiffs even want a class certified if they lose on the merits? I don't have a clear answer for that, Your Honor. I believe that they think that... Why would a court, if it decided the name plaintiff loses, why would it then go forward and certify a class and thereby sink every member of the class? I don't know how that could happen, and I don't know what evidence would support having a remedy go from one student across 200 students due to the highly individualized nature of the disabilities here at issue. But it really goes back to the issue of whether, say, we'll use DLC as an example, whether it has standing and whether it is required to exhaust even if it has standing. Normally when we think about standing, we're concerned about whether the remedy for the alleged wrong can be properly obtained by that particular institution wanting standing. But you don't seem to have really protested that they don't have standing. If I remember your brief correctly, maybe I'm misremembering. You do insist that they have to exhaust just as though an individual student for the plaintiff. That's correct, Your Honor. Judge Mastroianni decided... We had raised an issue of standing in our motion to dismiss on the pleadings, and Judge Mastroianni did not decide the dismissal based on that argument. Rather, he decided it based on the authority to exhaust.  It's supported under FRI. Under what, I'm sorry? Under FRI, under the reasoning of FRI. But even as associational plaintiffs, if what they're really seeking is something that's available under the IDEA, then they, just like any other plaintiff, would have to exhaust. My brother, Counsel Chen Holstrom, will be further addressing the issues with regard to associational plaintiffs. Thank you. Thank you, Counsel. Mr. Holstrom, good morning. Good morning, members of the panel. Stephen Holstrom representing the cross appellees dealing with the issue in our cross appeal standing and intervention, that is a standing of the associational plaintiffs and intervention for the student M.W. on behalf of the class. May it please the court. In the first instance, in response to a question by Judge Lynch regarding standing, there is an argument, respectfully, in our brief regarding injury in fact, as to DLC and PPAL, and that DLC and PPAL don't meet the indicia of membership test under HUNT to show that those organizations have an actual injury. Specifically, DLC and PPAL are in different organizations. It's important to remember that DLC is a state protection advocacy organization that is subject to the PAMI scheme. PPAL is not. With respect to PPAL, they don't behave like a membership organization, and in fact, they've done little more than allege that they have a constituency. So I think a DLC has the better claim. So focus on DLC. Certainly, Your Honor. So with regard to DLC, there are two issues independent of the injury in fact issue, and that's that the PAMI statute itself does not confer standing. There seems to be an argument on behalf of the plaintiffs that simply because there's language in the PAMI statute that says they may pursue legal remedies, that's the end of the inquiry. Certainly, it's clear that Congress can't legislate beyond Article III, and secondly, the third part of HUNT states that neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit. And in this case, we're talking about education. Faith in the LRE is the gravamen of the plaintiff's complaint. So could you give an example under your theory of a claim that DLC could bring on its own, standing alone, without any individual? Well, they represent individuals in non-educational contexts. It's clear. Give me an example of a claim where it's just DLC v. sub-defendant. It could be a patient who's confined, a psychological patient. PMA organizations, it has been held that they may sue to obtain records for individuals who are disabled that are held in certain other institutional settings. So if DLC could bring a claim on behalf of a patient, why couldn't it bring a claim on behalf of a student? Assuming injury in fact, but that's assuming injury in fact. They can't bring a claim on behalf of the student because of the operation of the IDEA and FRI. So if the plaintiff's- Well, so now you're off not on standing. Now you're talking about exhaustion doctrine. Well, I think that the issues do intertwine because, again, one of the standing factors is the requirement of individual participation. That's largely thought not to be an Article III factor but a more discretionary factor. Certainly. And there is the case Carnahan, as I said in my brief, disagrees with that point of view and says it's not prudential. I'm sorry, that it hasn't been congressionally abrogated because if it's not an Article III factor and it's a prudential factor, Congress may abrogate it. And even if they have, in certain circumstances here, they didn't need to abrogate the substantive law of the lawsuit that you have to look at underneath. That is, simply by saying in the painting statute that a P&A organization can pursue legal remedies, they didn't say, well, you don't have to look at the actual relief being sought. And here the relief being sought, as I said and as my colleague, Attorney DeSouza, alluded to, is fundamentally individual. To put it another way, if the plaintiff's argument was to be accepted by this court, there would essentially be two different tracks this type of litigation with the same facts and the same relief being sought could take. That simply doesn't make sense. You could have the first track, which is the traditional track, where a student would go through the IEP team meeting process. There would be a discussion about the appropriate placement. Rarely do those result in a disagreement. As my brother said, there's only a handful of BSEA cases a year, I think, using his number, 20 or 30. If they did, they could exhaust and then there would be a court with an administrative record. They're saying if DLC can bring suit and we can skip right to the judicial step without any delving into the needs of the individual student at not even the administrative level but the IEP process because they're simply saying that the IDEA doesn't apply. That's simply the result that the court can't countenance in this situation. I did want to say one word, a few words about intervention, and that is M.W.'s clearly not an adequate class rep. He's had accepted IEPs placing him at a more restrictive setting every step of the way. In fact, he's being educated in a setting even more restrictive. I'd like to go back to Judge Kayada's question to you. Certainly. But I want you to come up with a case where you think DLC might well have standing under the HUNT test as to a public school student. I'm not sure, Your Honor, that in the educational arena they would have standing. I can say that it would be appropriate for them to help the student through the IEP process. Apart from a special needs context, except they exist because it's the disability law center, so their purpose in existing has to do with disabled students. Exactly. So they may have standing, for example, if there was an access to the school issue. If a disabled student, if they didn't have a wheelchair ramp or some other non- an ADE example that would be outside of the fry clues, for example, maybe DLC could sue to enforce those rights because you wouldn't have an IDEA issue in that circumstance. So they would have standing. And then how would that work from a race judicata standpoint at the conclusion of that litigation? I'm saying they would have standing for the sake of argument. I'm not conceding they would have standing. So I think that's a concern that from a race judicata standpoint the individual rights, if there was a disagreement between DLC and what the particular student wanted, could be affected by allowing DLC to bring a suit in this manner. Would that change if there was a class certification? I think the problem exists. Well, it exists in every class action that basically even a person that aren't part of the class may be bound by the result. Certainly, but the class needs to be certified, and part of that isn't just commonality. I understand that, but if the class was certified, then you wouldn't have that problem, would you? But a certified class is certified in part because there's adequate representation of every member of the class who has a common injury. There's no real requirement under Paney for an adequacy. There's no adequacy test under Paney. They just simply say that we can sue and force these rights. If there are no other questions, I can rest on that. Thank you. Thank you. Counsel, I realize you have very little time, but I would just like you to tell me whether you think Fry has any relevance to this case. I think Fry has relevance only in a contingency where the court is headed for affirming and needs to determine whether these claims required exhaustion in the first place. We do not need to prove that in order to succeed on our appeal because, again, SS exhausted his remedy. By the time DLC and PPAL were dismissed as second students, it's part of the record, had exhausted the same complaint in front of the DSEA, and there's no reason under either classification doctrine or associational standing doctrine that more exhaustion should have happened. I think Fry comes into play only if you accept what is essentially an argument that, in an educational context, there is a unstated exception, not intended by Congress because the congressional history says that they don't intend for every kid to have to exhaust. So you have to find it. Despite that congressional intention, there's an exception to the general rule that only one plaintiff in a class action in a civil rights case has to exhaust. If you're right on associational standing, why do you even care about Rule 23 certification? Because you could just be off to the races with your own independent associational standing, kind of free-range litigating an issue that would potentially bind everybody in the class. So why not skip the whole Rule 23 process? Well, I think, first of all, the class is entitled. This matter relates back to the class certification motion, and we're entitled to class certification. So are you required as a condition of associational standing to seek class certification? Absolutely not. And suppose you didn't seek it. Would the result be the same as if you got a class certified? I think it largely would be. So that brings me back to my question. It seems to me that if you're right on associational standing, then for purposes of these type of cases, Rule 23 becomes an irrelevant consideration. And that would seem to be an odd result. Well, I think that these cases are pretty unusual. I also think that there's a reason we've upheld the denial of class certification. It's a published decision in which we contend the court has, frankly, without the benefit of briefing or argument on the issue, grafted onto the ADA insofar as the ADA is applied in public schools an exception for the class certification that doesn't pertain in any other civil rights statute and that at least two other courts of appeals have held does not apply in the ADA or IDA context in which Congress, as cited in our brief, said it didn't want every kid to have to exhaust. So I think even if the court were inclined to not, to direct essentially that the case proceed on an associational basis alone, there would be good reason to reverse or vacate that decision. Could you address the numbers we heard earlier? We heard 2,000 IEPs, 700 students with emotional disorders serious enough to require some type of IEP approach. And of those, 200 end up in the special day schools, but the other 500 end up where non-segregated. That sounds like that paints a picture of a spectrum, not a binary cutoff. In other words, some degree of behavioral problems they're able to accommodate in the school and then they get to a point and they don't. It seems that pushes back against the notion that we would deal with the 200 as a single entity rather than each individual child based on the child's circumstances. Respectfully, Your Honor, I think that much of the factual basis for that question is based on representations of counsel that aren't in the record or that certainly haven't been contested through trial. We're here on the pleadings in the motion for class certification. So those numbers are not in the record that we were told? Some of them may have been asserted in— The class certification opposition weren't there. In the opposition to class certification. Which ones weren't in the record? I'm not sure of any of the numbers that you stated. Certainly the issues that counsel was discussing about children under desks and children leaving rooms, that's not part of the class certification. Thank you. Thank you, Your Honor.